STATE OF WYOMING, Oscar E. Swan, Commissioner of Public Lands, Plaintiffs-Appellants,

v.

Cecil D. ANDRUS, Secretary, United States Department of Interior, Defendant-Appellee.

No. 77-2031.

United States Court of Appeals, Tenth Circuit.

July 18, 1979.

E. Michael Weber, Asst. Atty. Gen., Cheyenne, Wyo. (John D. Troughton, Atty. Gen., Cheyenne, Wyo., on brief), for plaintiffs-appellants.

Michael A. McCord, Dept. of Justice, Washington, D. C. (James W. Moorman, Asst. Atty. Gen., Washington, D. C., Charles E. Graves, U. S. Atty., Toshiro Suyematsu, Asst. U. S. Atty., Cheyenne, Wyo., and Robert L. Klarquist, Dept. of Justice, Washington, D. C., on brief), for defendant-appellee.

Before SETH, Chief Judge, and McWILLIAMS and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

## INTRODUCTION—EXPLANATION OF ISSUES

The ultimate question which is presented in this case is whether Wyoming is entitled to so-called lieu lands for acres included within rights-of-way previously granted to the Union Pacific Railroad. Wyoming is entitled to compensatory grants if it is de-

termined that the conveyances of railroad rights-of-way to the Union Pacific constituted prior dispositions of the areas included within those conveyances to the railroad as the term "prior disposition" is used in the Wyoming Enabling Act. Wyoming maintains that these conveyances to the railroad were lands "otherwise disposed of", the words used in the Enabling Act as the test for determining indemnity lieu selections to replace the disposed of portions.

The district court, The Honorable Ewing Kerr, ruled that Wyoming was not entitled to a patent which excluded the railroad right-of-way portion from certain school sections, and that Wyoming was not entitled to select indemnity or lieu lands for the acres encompassed within the railroad right-of-way. *Wyoming v. Andrus*, 436 F.Supp. 933 (D.Wyo.1977).

The facts are stipulated, and the judgment was rendered on the basis of motions for summary judgment filed by both sides. As noted, the motion of the Secretary of the Interior was granted.

The controversy had its beginning in July 1970, at which time Wyoming filed an application, W–24998, seeking a patent for certain school sections traversed by the right-of-way of the Union Pacific Railroad.[1] The actual controversy arose in conjunction with Wyoming's request for a patent which excepted from the school sections that portion in the original main line right-of-way of the Union Pacific Company. The sections involved are located in Laramie County, Wyoming, and the patent was requested pursuant to 43 U.S.C. § 871a (1970), which section has been repealed by the Act of October 21, 1976, Pub.L. No. 94–579, § 705(a), 90 Stat. 2743.

The Bureau of Land Management (BLM) rejected the Wyoming application on the ground that Wyoming could not exclude or except the acreage in the Union Pacific right-of-way from its patent application since the law gave it the entire section. The BLM's position was that any patent would have to be issued for a school section based on the full legal description, but subject to the right-of-way.

On December 10, 1971, Wyoming filed application W–32556 for lieu land selections for the acreage in the right-of-way which it had excluded from the previous patent application. The request was made pursuant to 43 U.S.C. §§ 851, 852. BLM rejected this application on the basis that Wyoming took title to the school land sections subject to the Union Pacific's right-of-way; that Wyoming was not entitled to indemnification for the acreage in the right-of-way.

The decisions of the BLM were appealed to the Interior Board of Land Appeals (IBLA), which affirmed BLM's decisions. State of Wyoming, 27 I.B.L.A. 137, 83 I.D. 364 (1976). The reasoning of the Interior Board was that the right-of-way grant to the Union Pacific[2] was a special grant in 1862 which did not give Wyoming a right to indemnity selections. Relied on was an administrative decision of the Interior Board under which Wyoming is not entitled to indemnification. *See* State of North Dakota, 13 L.D. 454 (1891).

The suit which was subsequently brought in district court sought a mandatory injunction, a writ of mandamus, a declaratory judgment and judicial review of Interior's allegedly arbitrary and capricious administrative actions. Wyoming sought to compel the issuance of the patent in the form that it had submitted, excepting the right-of-way of the Union Pacific.

The district court's ruling was that Wyoming's Enabling Act gave it a fee interest in the right-of-way subject to the railroad's easement and the reservation by the United States of minerals. *See Wyoming v. Andrus*, 436 F.Supp. 933, 934 (D.Wyo.1977).

---

1. The information is that there are 258 acres directly in dispute in this case. We are not told whether there are many other acres within Wyoming and other states which may well be affected by the outcome of this decision. The Enabling Act gave Wyoming sections 16 and 36 of each township for school purposes. Act of July 10, 1890, ch. 664, § 4, 26 Stat. 222.

2. Act of July 1, 1862, ch. 120, 12 Stat. 489, *as amended by* Act of July 2, 1864, ch. 216, 13 Stat. 356.

The reasoning of the court was that the grant to the Union Pacific of the coal and iron in the right-of-way was a profit a prendre. The court held further that Wyoming held the fee interest in the right-of-way and thus that there was not a prior disposition of the land such as would entitle Wyoming to indemnification.

Wyoming's position, on the other hand, is that the railroad right-of-way was land otherwise disposed of.

The Secretary argues that the grant of the right-of-way to the railroad did not render the land otherwise disposed of; that this did not constitute a prior disposition; and so Wyoming is not entitled to be indemnified with other lands to compensate for the grant of right-of-way to the railroad.

The issue is simply stated even though hard to resolve. If the grant to the railroad was a disposition, Wyoming is entitled to be indemnified in accordance with the school land grants made in its Enabling Act in 1890. If Congress did not intend that this should be a prior disposition, and if indeed it was not, Wyoming would not be entitled to indemnification. So, our analysis must include consideration of the property interest that was granted to the railroad and what, if anything, was granted to Wyoming. Only then can we decide whether there has been a prior disposition of the portion of the school sections that are here under consideration. If Wyoming received a vested fee interest in the right-of-way subject to the railroad's rights, it could not claim that there had been a prior disposition giving rise to indemnification in its favor. If this court were to hold for the government here, it would have to determine that the Union Pacific received only a limited right in land, an easement, and that the United States retained the fee interest, whereby it could have conveyed that to Wyoming in the school land grants in the Enabling Act.

The case of *Wyoming v. Udall*, 379 F.2d 635 (10th Cir.), *cert. denied*, 389 U.S. 985, 88 S.Ct. 470, 19 L.Ed.2d 479 (1967), comes close to our problem, but falls short. There this court concluded that Wyoming had no interest in the minerals underlying the right-of-way. The case held that the Union Pacific had a right-of-way together with the right to explore for and mine coal and iron with a reversion to the United States if the land ceased to be used for railroad purposes.

Apparently the matter in issue is *ownership* of the surface of the right-of-way.[3] To better understand this it is necessary to consider some of the history together with the form of the grants. First, we take up the right-of-way granted to the Union Pacific.

## HISTORICAL FACTS AND LAW

In 1862, the Union Pacific was granted a right-of-way through the public lands for the construction of a railroad. Act of July 1, 1862, ch. 120, § 2, 12 Stat. 489. Section 2 provides for the right-of-way as follows:

That the right of way through the public lands be, and the same is hereby, granted to said company for the construction of said railroad and telegraph line; and the right, power, and authority is hereby given to said company to take from the public lands adjacent to the line of said road, earth, stone, timber, and other materials for the construction thereof; said right of way is granted to said railroad to the extent of two hundred feet in width on each side of said railroad where it may pass over the public lands, including all necessary grounds for stations, building, workshops, and depots, machine shops, switches, side tracks, turntables, and water stations.

Thus, it was not only granted a right-of-way through the public lands for the purpose of constructing a railroad and a telegraph line. Also granted was the right, power and authority to take from the public lands adjacent to the line of said road, earth, stone, timber, and other materials for the construction of the railroad. The width

---

3. If the fee title was conveyed to the Union Pacific in 1862, that ends the matter. Although there are indications that it was a fee title, there are strong evidences that this right-of-way was not intended to be and was not a fee title.

of the right-of-way was 200 feet on each side of the railroad.

It is important to note that Congress granted odd-numbered sections at the same time so as to encourage construction of the railroad. This was in the same Act at Section 3. Our only direct interest is in Section 2.

We must also note that in 1864, the right-of-way granted was reduced from 200 feet to 100 feet. However, the odd-numbered sections granted to the railroad were increased, and the railroad was given the right to coal and iron, but not other minerals in the right-of-way. *See* Act of July 2, 1864, ch. 216, §§ 3, 4, 13 Stat. 356.

Some of the cases explain that the purpose of these large grants to the railroad of land in the public domain was to encourage the railroads to carry out the building of the rails, which was a hazardous venture. *See Leo Sheep Co. v. United States,* —— U.S. ——, 99 S.Ct. 1403, 1404–05, 59 L.Ed.2d 677 (1979), and *United States v. Union Pacific Railroad Co.,* 91 U.S. 72, 79, 23 L.Ed. 224 (1875).

The public became dissatisfied, during the 1870's, with the government's grant to the Union Pacific, and as a result Congress discontinued the outright grants. *See Great Northern Railway Co. v. United States,* 315 U.S. 262, 274, 62 S.Ct. 529, 86 L.Ed. 836 (1942), and *Wyoming v. Udall, supra,* at 638. In 1875, as a result of the changed attitude, Congress passed the General Right-of-Way Act.[4] This granted an easement only to railroads in subsequent grants. *Great Northern Railway Co. v. United States,* 315 U.S. 262, 277, 62 S.Ct. 529, 86 L.Ed. 836 (1942). The 1875 Act is, therefore, somewhat significant in that it reduced the quality of the grant to the railroads. This shows that it was something more than a simple easement prior to 1875.

In 1903, for example, the Supreme Court labeled the interest conveyed to the railroad prior to 1871, the right-of-way grant, as a "limited" or "qualified" fee with an implied condition of reverter in the event that the railroad ceased to use the right-of-way for railroad purposes. *Northern Pacific Railway Co. v. Townsend,* 190 U.S. 267, 271, 23 S.Ct. 671, 47 L.Ed. 1044 (1903). Also, the right-of-way grant (prior to 1871) deprived the land of its status as "public lands" so that homesteaders who filed after the railroad grant received no interest in the right-of-way.

The Supreme Court has ruled that a pre-1871 right-of-way was more than a mere easement. *United States v. Union Pacific Railroad Co.,* 353 U.S. 112, 119, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957), *quoting Great Northern Railroad Co. v. United States,* 315 U.S. 262, 278, 62 S.Ct. 529, 86 L.Ed. 836 (1942). We do not suggest that the use of the term "limited fee" served to resolve the issue now before us as to the scope and quality of the right which the railroad received in its 1862 grant. *United States v. Union Pacific Railroad Co.,* 353 U.S. 112, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957), *quoting Great Northern Railroad Co. v. United States,* 315 U.S. 262, 278, 62 S.Ct. 529, 86 L.Ed. 836 (1942), commented on the "limited fee" concept. It was there said:

> The most that the "limited fee" cases decided was that the railroads received all surface rights to the right of way and all rights incident to a use for railroad purposes.

353 U.S. at 119, 77 S.Ct. 689. The Supreme Court also held that the minerals belonged to the United States and not the Union Pacific. *Id.* at 118–120, 77 S.Ct. 529.

This court in *Wyoming v. Udall, supra,* through Judge Breitenstein, also had something to say about the "limited fee" idea. It said that it was a label which disappeared with the expansion of the meaning of the easement. *Udall* noted the uncertainty in the use of the term "right-of-way" and noted the confusion as to pre-1871 rights-of-way and post-1871 grants. *Id.* at 638 & n.15. The *Udall* opinion explained that:

---

**4.** Act of March 3, 1875, ch. 152, § 1, 18 Stat. 482. This statute was codified at 43 U.S.C. § 934, but was repealed and superseded by the Act of Oct. 21, 1976, Pub.L. No. 94–579, § 706(a), 90 Stat. 2743.

The concept of "limited fee" was no doubt applied in Townsend because under the common law an easement was an incorporeal hereditament which did not give an exclusive right of possession. With the expansion of the meaning of easement to include, so far as railroads are concerned, a right in perpetuity to exclusive use and possession the need for the "limited fee" label disappeared.

*Id.* at 640.

From all of this it is not possible to draw a conclusion as to what was meant by the grant of the right-of-way of the Union Pacific in 1862 and 1864. There seems little doubt, however, that the Union Pacific received all surface rights and all rights incident to a use for railroad purposes. At the same time, it did not own the minerals with the exception of the iron ore and coal.

The other conclusion that can be drawn is that the Union Pacific's interest is tied to use of the land for railroad purposes. If the Union Pacific should cease to so use the land, it would revert to the fee owner, whoever that is. For practical purposes, there does not seem to be any foreseeable likelihood that the Union Pacific will abandon the grants of land, for there is no apparent possibility that it will cease its railroad purposes.

Next, we must consider the grants to Wyoming for school purposes. Sections 16 and 36 in each township were reserved for public school purposes by the Act of July 25, 1868, ch. 235, § 14, 15 Stat. 178. The reservation was not itself a grant, but it was designed to protect the land from homesteaders and squatters grabbing lands before Wyoming had changed from a territory to a state. *See United States v. Wyoming*, 331 U.S. 440, 446–47, 67 S.Ct. 1319, 91 L.Ed. 1590 (1947).

It was in 1890 that Wyoming became a state pursuant to the Act of July 10, 1890, ch. 664, 26 Stat. 222. The Enabling Act granted the sections noted in every township in the State of Wyoming in support of the common schools. *Id.* at § 4. Important for our purpose is that the Act specifically provided that Wyoming is entitled to make selections of lieu lands if any part of a school section had been "sold or otherwise disposed of" before the grant to Wyoming. *See* § 4, *supra.*[5]

## DISCUSSION AND ANALYSIS

The school land grants were, of course, subsequent to the grant to the Union Pacific in 1862, and so this case turns on whether in 1890, when Wyoming received the school sections, there had been a prior disposition of a part of a school section to the Union Pacific activating the section making provision for indemnity. The General Indemnity Act of 1891[6] made provision for indemnification of states when school land sections had prior claims based on preemption or homesteading, minerals, an Indian, military, or other reservation, or other dispositions.

■ Congress was not unaware of the railroad right-of-way at the time, but it did not mention specifically in the General Indemnity Act that the grant of the right-of-way was a basis for indemnifying. The Act was passed in 1891, almost contemporaneously with the Wyoming Enabling Act, and its intent was to lay down uniform standards for granting lieu lands to the states. *See United States v. Wyoming*, 331 U.S. 440, 451, 67 S.Ct. 1319, 91 L.Ed. 1590 (1947).

43 C.F.R. § 2842.1(a) (1978), declares that the grantee takes the fee interest in the

**5.** The specific language of this grant was as follows:

SEC. 4. That sections numbered sixteen and thirty-six in every township of said proposed State, and where such sections, or *any parts thereof,* have been sold or *otherwise disposed of* by or under the authority of any act of Congress, other lands equivalent thereto, in legal subdivisions of not less than one quarter section, and as contiguous as may be to

the section in lieu of which the same is taken, are hereby granted to said State for the support of common schools, such indemnity lands to be selected within said State in such manner as the legislature may provide, with the approval of the Secretary of the Interior. (Emphasis added.)

**6.** Act of Feb. 28, 1891, ch. 384, 26 Stat. 796 (codified at 43 U.S.C. § 851).

entire legal subdivision subject only to the railroad's right of use and possession. It is unquestionably applicable to the grants to railroads pursuant to the 1875 Act.[7] It is less clear, however, as to whether it can be applied to pre-1871 grants such as we here consider.

We have noted above that pursuant to 43 U.S.C. § 871a, provision is made for the issuance of patents for the school sections. Wyoming sought to have such a patent issued excluding the grant to the Union Pacific. The government refused to issue a patent in these terms. Instead it sought to issue the patents subject to prior conditions, limitations, easements, or rights, if any.

■ It must be mentioned that the school sections granted to Wyoming did not formally vest until completion of the survey. The sections under consideration here were surveyed prior to statehood, so title vested in Wyoming in 1890 in accordance with the Enabling Act.

The decision rendered by this Circuit in *Wyoming v. Udall, supra,* had a limited concern. This was determination of the right to the minerals beneath the surface of the right-of-way property granted to the Union Pacific. The conclusion was that neither the railroad nor Wyoming was entitled to these minerals. The United States was held to have not conveyed them. This aspect of the grants to the Union Pacific and to Wyoming argues against the conclusion that there was a "prior disposition" of the land to the Union Pacific. However, the opinion of the court in *Wyoming v. Udall, supra,* stated in passing that there had been in fact a prior disposition to the railroad. This was, however, an observation which was unnecessary to the decision and hence cannot be considered binding here.

At the time that the grant to Wyoming was executed, the government could have granted the minerals to Wyoming if it had intended to do so and indeed if it had intended to transfer the fee title to Wyoming.

Thus, it can be argued that Congress never intended to grant the minerals located in the right-of-way area in a school section to Wyoming under the terms of the Enabling Act, and undoubtedly this is what Judge Breitenstein conveyed in the *Wyoming v. Udall* decision.

■ Even though Wyoming has no present interest in the right-of-way, it certainly can be argued that it has a reversionary interest under the Railroad Right-of-Way Abandonment Act, 43 U.S.C. § 912.[8] This provision is that in the event the railroad forfeits or abandons the right-of-way (for railroad purposes), title to the right-of-way then vests in the person who owns the legal subdivision traversed by the right-of-way. Section 912, *supra.* The reason that Congress adopted this measure was because this narrow strip of land would have little use or value to the government. Under the statute the minerals would not become the property of Wyoming or whomever the fee owner happens to be. They are reserved for the United States.

There are, of course, contingencies here so as to render this argument somewhat questionable. Certainly it should not be the basis for a decision that Wyoming is not entitled to be indemnified. The statute does not prohibit present indemnity· for such right-of-way abandonments, but Wyoming is in a disadvantageous position because it continues to assert title to the reversionary interest in the right-of-way in addition to asserting entitlement to lieu lands. In a previous case, Wyoming claimed both the lands within the school sections and additional acreage within the resurveyed sections, but outside the boundaries of the original ones. *Wyoming v. United States,* 310 F.2d 566 (10th Cir. 1962), *cert. denied,* 372 U.S. 953, 83 S.Ct. 952, 9 L.Ed.2d 977 (1963). This court, however, refused to grant title to more acreage than was included by a grant of sections 16 and 36 of every township. *Id.* at 580.

---

7.  Act of March 3, 1875, ch. 152, § 1, 18 Stat. 482.

8.  Act of March 8, 1922, ch. 94, § 1, 42 Stat. 414 (codified at 43 U.S.C. § 912).

The recent decision of this court in *Utah v. Kleppe*, 586 F.2d 756 (10th Cir. 1978), *cert. granted,* —— U.S. ——, 99 S.Ct. 2857, 61 L.Ed.2d 296 (1979), is not authority here. It is true that that case considered the propriety of indemnity selections made by Utah, but the question of whether there was a right to indemnity was never considered.

Nor is *Chicago & North Western Railway Co. v. Continental Oil Co.,* 253 F.2d 468 (10th Cir. 1958), germane. There we merely followed the Supreme Court's ruling in *Great Northern Railway Co. v. United States,* 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836 (1942). We denied the railroad any right to the minerals underlying a right-of-way acquired under the 1875 Act. *Id.* at 470–71, 62 S.Ct. 529.

## CONCLUSION

■ In sum, it would appear that the Congress intended for Wyoming to take the sections subject to the railroad right-of-way.

Perhaps the strongest argument is that the statute laying down the conditions for obtaining lieu lands simply does not cover this situation. The General Indemnity Act of 1891 (as we have noted), provided for indemnification of states when the school land sections had prior claims based on (1) preemption or homesteading, (2) minerals, (3) an Indian, military, or other reservation, or (4) other dispositions. The lands that are here involved were not, in our judgment, otherwise disposed of. That is the only possibility as far as Wyoming is concerned. The railroad was granted a right-of-way and, as Judge Kerr said, profits a prendre in the coal and iron in aid of the building of the railroad. It does not have any tendency to show a disposition of the property there involved. In other words, it was not conveyed to the Union Pacific. It could be regarded as a possibility of reverter which is owned by Wyoming. Whether it will materialize is something else. We are required to evaluate it as best we can.

Very early, in fact in 1891, the Secretary of the Interior was called on to make the very interpretation which is before us. State of North Dakota, 13 L.D. 454 (1891). One important interpretation is that

No provision is made by law for indemnifying the state in cases where the school section is crossed by railroads, claiming the right of way either under the act of March 3, 1875, or by a special grant from Congress . . . .

*Id.* at 454–55.[9]

9. Because of the importance of this interpretation we include its entire text as follows:

I am in receipt of your communication of the 23d ultimo, inquiring as to how the State of North Dakota is to be indemnified for lands in school sections that are covered by right of way of the various railroad companies.

The act of March 3, 1875 (18 Stat., 482), grants the right of way through the public lands to any railroad company duly organized under the laws of any State or Territory, except the District of Columbia, or by Congress, which shall have filed with the Secretary of the Interior a copy of its articles of incorporation and due proofs of its organization under the same.

The approval of the maps of the road by the Secretary of the Interior, as provided for by the 3d section of said act, merely indicates that the company has complied with the terms of the act, so far as to entitle it to the benefits thereof, and that the line of road between the terminal points is such as was authorized by the act. It does not pretend to decide which of the tracts traversed by the road are public lands within the meaning of the act, or which are private lands or possessory claims, controlled by the 3d section of the act. It approves the right of way as designated by the map, subject to all existing valid rights. If the line of road should cross any military, park, or Indian reservation, or other land specifically reserved from sale, the approval of the Secretary would be withheld, unless such right of way was provided for by treaty stipulation, or by act of Congress. But I am not aware that the approval of the Secretary has been withheld where the line of the road crosses school sections, but, on the contrary, the maps of the company showing that the line of road crosses school sections have always been approved, it being considered that school sections are generally reserved, and that they do not come within the terms "other lands specially reserved from sale," which refer to the reservation of

Highly important is the fact that this interpretation was given contemporaneously with the passage of the General Indemnity Act of 1891, codified at 43 U.S.C. § 851. It was, of course, only one year after the Wyoming Enabling Act was passed, but more important than the contemporaneous factor is that this ruling was not challenged by any state for close to 80 years. The lack of evidence of dispute leads to the conclusion that the states accepted the Department's view that it was not the intent of Congress to indemnify the states for railroad rights-of-way which crossed school sections.

Where, as here, an administrative ruling has stood unchallenged for a long period of time, the Supreme Court has indicated its reluctance to upset it. *See United States v. Wyoming*, 331 U.S. 440, 454, 67 S.Ct. 1319, 91 L.Ed. 1590 (1947). There was the further fact in the case that Interior's decisions for over 50 years had consistently stood by the position that a title to unsurveyed school sections went to the state only following completion of the survey; that prior to the survey completion the United States could make such reservations and dispositions of the lands in question as the public interest required and as applicable statutes required.

This court has also been reluctant to disturb or interfere with the long-standing administrative practice of *Wyoming*. *Wyo-*

*ming v. United States*, 310 F.2d 566, 580 (10th Cir. 1962), *cert. denied*, 372 U.S. 953, 83 S.Ct. 952, 9 L.Ed.2d 977 (1963).

So, on this account, Wyoming's position as a litigant cannot be viewed as having very strong equities, if any. It could have brought this action long ago. Its inactivity must be regarded as highly significant in this balancing process.

Judge Kerr, in speaking of this, unhesitatingly adopted the Secretary's opinion and emphasized the length of its standing. He stated it very succinctly:

The subject matter with which we are dealing was laid to rest in 1891 by a ruling of the Department of the Interior establishing the policy as to the area covered by a railroad right-of-way. The ruling held:

"No provision is made by law for indemnifying the State in cases where the school section is crossed by railroads, claiming the right-of-way either under the act of March 3, 1875, or by a special grant from Congress . . ." 13 L.D. 454

This decision affecting all public land states has prevailed for 87 years. I have found no cases to the contrary. Indeed, the case at bar raises the issue for the first time since the 1891 decision. There has been universal acceptance of the rul-

---

a specific tract of land within designated boundaries.

No provision is made by law for indemnifying the State in cases where the school section is crossed by railroads, claiming the right of way either under the act of March 3, 1875, or by a special grant from Congress, but, if the roads are not entitled to the right of way over such sections, recourse must be had by the State or its purchasers against the company in the courts.

Under the act of March 3, 1875, the right of way may be granted over unsurveyed lands, and the line of road may be designated by actual construction before survey. If the company has filed its articles of incorporation and due proofs of organization, it is entitled to build its road, but within twelve months after the filing of the township plat of

survey of the lands crossed by the road, the company must file a map showing the line of said road over the public surveys, in order that it may be noted on the plats of the land office. If proper in all other respects, these maps are approved, notwithstanding they cross school sections, and doubtless in many instances the road was actually constructed before the number of the section was indicated by survey.

When the right of way is claimed under a special act, it must be controlled by the terms of the act, but what has been said of the act of March 3, 1875, will, generally, apply to special acts of Congress. As a general rule, the right of way is granted over the public lands, providing for the condemnation of private lands and possessory claims.

ing for over eight decades by the state officials dealing with public lands.

States seeking patents to school sections in place have been required to regard a school section invaded by pre-1871 railroad right-of-way as a full section, and patents have issued reciting simply that the grant is "subject to" the right-of-way of the railroad under the particular granting act.

The laws affecting grants of school sections, 43 U.S.C. §§ 870, 871 (1970), and those involving school indemnity selections, 43 U.S.C. §§ 851, 852 (1970), were amended in 1932, 1954, 1956, 1958, 1960, and 1966. Congress declined to make any change in the Department's practice of patenting school lands subject to a special· grant railroad right-of-way in any of these amendments.

436 F.Supp. at 933–34.

In view of the foregoing, the judgment of the district court must be and it is hereby affirmed.